Mr. John Joseph Leahy, Washington, D. C., for appellant.

Mr. Austin P. Frum, Washington, D. C., with whom Messrs. Thomas S. Jackson, Robert M. Gray and John L. Laskey, Washington, D. C., were on the brief, for appellee.

Before EDGERTON and BASTIAN, Senior Circuit Judges, and BURGER, Circuit Judge.

## MUTUAL BENEFIT HEALTH AND ACCIDENT ASSOCIATION, Appellant,

v.

### Josephine L. MESSINA, Appellee.

### No. 18815.

United States Court of Appeals District of Columbia Circuit.

Argued Feb. 2, 1965.

Decided June 3, 1965.

Petition for Rehearing Before the Division Denied Sept. 23, 1965.

Petition for Rehearing En Banc Denied Sept. 29, 1965.

PER CURIAM.

This is an appeal from a judgment of the District Court, after trial, in favor of appellee, who sued as beneficiary to recover the face amount of an air travel insurance policy purchased by her husband from an agent of appellant at Tachikawa Air Force Base, Japan, before embarking on a trip to Washington, D. C. He was fatally injured, while a passenger, by the crash of an air taxi between Travis Air Force Base and San Francisco International Airport. The question is whether the policy covered the taxi flight. The facts are fully stated in the District Judge's memorandum of April 24, 1964, as amended May 8, 1964. We agree with his opinion and therefore affirm the appealed judgment.

Affirmed.

BURGER, Circuit Judge (dissenting).

The majority affirms the judgment of the District Court without undertaking any analysis of the issues. Since this is an important case and will probably affect the entire air travel insurance industry and its underwriting and actuarial bases I deem it imperative to analyze the issues so that what the court does will be apparent.

This is an appeal from a judgment of the District Court in favor of Appellee, who sued as beneficiary to recover the face amount of an air travel insurance policy purchased by her husband Messina from an agent of Appellant at Tachikawa Air Force Base, Japan, before embarking on a flight to Washington, D. C. The decedent was a civilian employee of the Department of the Army traveling on government travel orders. The travel orders covered passage from Tachikawa to Travis Air Force Base, California, on a commercial carrier flight contracted for by the Military Air Transport Service (MATS). On his arrival at Travis, Messina bought a United Airlines ticket from San Francisco to Washington with a government transportation request. With $15 of his own money he obtained a ticket for an air taxi flight operated by Travis Transporation Company, Inc., a non-scheduled carrier operating between Travis Air Force Base and San Francisco International Airport. The air taxi crashed, fatally injuring Messina.

The only issue before the District Court, and before us on appeal, is whether the insurance policy covered the fatal flight. No fact issues are involved; stipulations of the parties have narrowed the issue to whether the air taxi flight between airports was one "contracted for by * * * the Military Air Transport Service (MATS) of the United States"; if so, it was expressly covered by the words just quoted from the policy.

Appellee's primary contention is that a document styled "Revocable Permit" to authorize landings and takeoffs by the air taxi company and issued by one Colonel Stark, an officer assigned to MATS, is a MATS "contract" within the terms of the insurance policy and that flights of the air taxi are therefore flights "contracted for by * * * the Military Air Transport Service * * * of the United States." I think this theory untenable. The revocable permit is simply a consent to the use, without charge, of the air base facilities by the air taxi company for the purpose of providing air taxi service under conditions laid down in the document. It was issued by Col. Stark as the "Base Commander, Travis Air Force Base, for and on behalf of the United States."[1] MATS is not mentioned in the permit.

Whether there is evidence to support the contention of Appellee, adopted by the District Court, that the taxi flight was "contracted for" by MATS depends upon the document constituting the taxi license read against the background shown by this record.

Appellee put in evidence a deposition taken by Appellant from the MATS commandant, General Kelly, to the effect that

> Airlift contracted by and for MATS is * * * furnished by a commercial carrier pursuant to a contract between the carrier and the U.S. Government, represented by MATS as an airlift service agency * * *. The contract defines the terms of service to be provided and

---

1. Undisputed testimony establishes that Col. Stark was serving a maintenance function unrelated to the characteristic MATS function of providing air transportation to military personnel. Thus at the time Col. Stark issued the permit, MATS happened to be the "host" command at the Travis base. As "host," MATS was responsible for the operations of the Base, including authority to issue permits for all aircraft to land and take off at the Base. Appellee's argument thus rests on the fortuity that MATS was the housekeeping unit for the Air Force at Travis when the permit was issued; had the permit been issued at an earlier date, it would have emanated from a unit of the Strategic Air Command.

the price to be paid therefor by the government.

In addition to this affirmative definition of what constitutes MATS-contracted-for air carriage there is similarly undisputed testimony of the president of the air taxi company that his taxi service was not "under contract" with MATS.[2] His views are not controlling; but when neither of the two alleged "contracting" parties considers that they have contracted, and the claim of a contract is made only by a *third* party, a legal stranger to the alleged contracting parties, I should think a court would need something resembling evidence in order to spell out a contract, especially when such important rights are rested on the claimed contract. Even if it is assumed *arguendo* that the revocable operating permit has some characteristics of a "contract" in a purely technical sense, we must recognize that the issue is not simply whether that permit is a contract but whether *the particular air-taxi flight* from one terminal to the other was one "contracted for" by MATS within the meaning of the insurance policy. The record does not make it clear, but for the purposes of this opinion I am prepared to assume, that Messina could have been reimbursed by the government for the cost of the air taxi ticket; however, this does not resolve the critical issue whether *MATS* contracted for the fatal flight under the terms of the policy.

I have great difficulty in following the District Court's reasoning. As I read the opinion of that Court, however, it first sets out some examples of supposed ambiguities in the policy. (If those provisions are ambiguous, there are no unambiguous insurance policies.) From these examples the Court concludes that the contract should have had a provision

warning clearly that the air-taxi flight was not covered. Having thus started to develop a position focusing on Messina's possible reliance on language thought misleading, the Court suddenly shifts into a discussion of the taxi-license-as-MATS-contract theory discussed above.

The Court seems to believe that its previous discussion concerning possible ambiguities in the contract bears on its technical analysis of the revocable-permit argument, for the opinion proceeds to that analysis "in the light of" its treatment of the supposed ambiguities and absence of warning. But the previous discussion of Messina's possible detrimental reliance is here out of place. It is hardly conceivable that Messina could have relied on *private* arrangements for an air-taxi service to use an air force base as amounting to a MATS "contract" within his insurance coverage; he simply would not have known of such arrangements. For this reason I believe the first part of the District Court's opinion—that dealing with Messina's possibly being misled by ambiguities—cannot come to the aid of the second part—the agonizingly strained interpretation which construes the revocable permit into a MATS "contract." So viewed, the taxi-license argument must stand or fall on its own. And it must fall, as I have indicated above.

No language in the policy suggests—and I do not think a reasonable traveler who reads his policy would believe—that a nonscheduled "air taxi" flight between airports was covered by a policy which in the boldest type restricts coverage to "Scheduled Airlines." To succeed, Appellee must show—and has not—that some provision of the policy her husband purchased provided coverage for inter-airport travel by nonscheduled air serv-

2. In view of the unchallenged testimony discussed in the text, I find inexplicable the District Court's assertion that "If the ordinary person in Mr. Messina's position had inquired whether the flight was * * * 'contracted for' by MATS, he would have been shown a document called a 'Revocable Permit.'" The record seems to me to indicate clearly that those to whom such an inquiry might appropriately have been directed—i. e., the spokesmen for the supposed "contracting" parties—believed the taxi license to have nothing whatever to do with the existence of a contract of carriage such as the insurance policy contemplated.

ice. Such coverage must first be found within the insuring clause and second it must not be excluded by any specified exceptions or exclusions. By one of the policy's express terms [3] the insured is covered "while riding as a passenger in, boarding or alighting from, or by being struck by an aircraft operated * * * by a scheduled airline * * * by, or contracted for by, the Military Air Transport Service (MATS) of the United States * * * or * * * while in or upon any premises *or surface vehicle used for passengers and provided or arranged for by such airline or the authorities controlling an established airport, but only while the Insured is in or upon such premises or surface vehicle for the purpose of beginning, continuing or completing the airtrip designated in the Schedule."* (Emphasis added.)

Thus the policy deals in precise and explicit terms with inter-airport transportation and the scope of insurance coverage between connecting flights; it carefully and plainly limits insurance coverage to *surface* vehicles operated by or for covered airlines and airports, and obviously an air taxi is, not such. As to what the insured probably understood, assuming for the moment that is relevant, I suggest that no person capable of reading could have been "misled" or in doubt. As to how judges ought to construe this contract language, we have the ancient and universally accepted axiom

3. Following is a copy of the face of the contract:

This Policy Is Nonrenewable and Provides Benefits for Loss of Life, Limb or Sight and Other Specified Losses Resulting from Accidental Bodily Injuries Received While a Passenger on Scheduled Airlines and Other Specified Conveyances or While on the Premises of an Airport to the Extent Herein Provided.

**Assessment Association** Pltfs. Exhibit No. 1

# MUTUAL BENEFIT HEALTH & ACCIDENT ASSOCIATION

OMAHA, NEBRASKA
(Herein called the Association) JUL 27 1964

**SCHEDULE** Policy T6AV **No.** 18228 A

(PLEASE PRINT)
Insured's Name SALVATORE H. MESSINA
Street 4103 - 41 ST. City BRENTWOOD State MD
Beneficiary's Name JOSEPHINE L. MESSINA
Street SAME City WASHINGTON State DC
Point of Departure TAW Destination WASHINGTON DC ☐ And Return
Principal Sum $50,000 Effective Date 25 Jan. 60 Premium $4.00

In consideration of the payment of the premium shown in the Schedule, the Association, subject to the provisions, limitations and exceptions of this policy, hereby insures the person named as Insured in the Schedule against loss of life, limb or sight and other specified losses resulting, independently of all other causes, from injuries. The term "injuries", wherever used in this policy, shall mean accidental bodily injuries received during any portion of the first one way or round trip which is made by the Insured, while this policy is in force, between the Point of Departure and the Destination designated in the Schedule and for which the Insured has purchased a transportation ticket or has been issued a pass; provided such injuries are received (1) while riding as a passenger in, boarding or alighting from, or by being struck by an aircraft operated on a regular, special or chartered flight (a) by a scheduled airline of United States Registry holding a Certificate of Public Convenience and Necessity issued by the Civil Aeronautics Board of United States of America or its successors, (b) by an intrastate scheduled airline of United States Registry maintaining regular published schedules and licensed for the transportation of passengers by a duly constituted authority having jurisdiction over civil aviation in the state in which said airline operates, (c) by a scheduled airline of foreign registry maintaining regular published schedules and licensed for transportation of passengers by the duly constituted governmental authority having jurisdiction over civil aviation in the country of registry of such airline, (d) by, or contracted for by, the Military Air Transport Service (MATS) of the United

Form T6AV - Series 597S

States, (e) by the Royal Canadian Air Force Air Transport Command or the Royal Air Force Air Transport Command of Great Britain, or (f) by the 315th or 322nd Air Divisions or the 5060th Transportation Squadron of the United States Air Force; or (2) while in or upon any premises or surface vehicle used for passengers and provided or arranged for by such airline or the authorities controlling an established airport, but only while the Insured is in or upon such premises or surface vehicle for the purpose of beginning, continuing or completing the airtrip designated in the Schedule.

of construction, "expressio unius, exclusio alterius." Unless we ignore both the language of the policy and the canons of construction I fail to see how we can sustain the judgment, for here we have a contract carefully drawn to cover only *one form* of inter-airport travel, *i. e.*, by *specified "surface* vehicles."

The only way we can sustain this award is to rewrite the contract, and the majority does this *sub silentio*.[4] That this is what is being done is shown by that portion of the policy reproduced by facsimile in the margin. See n. 3, *supra*.

---

4. As an appellate court we need no specific record evidence to recognize that insurance actuaries, in calculating premiums on insurance, must gauge the premium to the scope of the risk. It is similarly well within the range of judicial notice that the risks of the relatively unregulated nonscheduled air taxis operating in and around airports are greater than the readily measurable risks of travel on regularly scheduled and rigidly supervised airlines. The cost of air travel insurance covering scheduled airlines is only a fraction of the cost for comprehensive coverage for air travel generally.

Apart from the erroneous result in this case the majority has approved an interpretation of a standard form of air policy which could easily have wide reverberations in the underwriting of air travel insurance generally because the court now blankets the more hazardous nonscheduled travel under coverage obviously calculated on the risks of scheduled airlines. If, as is now held, nonscheduled air taxis are covered by this policy, it may well be argued that nonscheduled flights generally are covered; no legal distinction can be seen between a nonscheduled air taxi flight between two airports and a nonscheduled flight from California to New York.