**WAVERLY TAYLOR, INC.,**
Appellant/Cross–Appellee,

v.

**Arnold POLINGER, et al.,**
Appellees/Cross–Appellants.

Nos. 87–50, 87–359.

District of Columbia Court of Appeals.

Argued June 14, 1989.
Decided Dec. 5, 1990.

Anne M. Magruder, with whom Susan L. Schor, McLean, Va. was on the brief for Waverly Taylor, Inc.

Laurence H. Berbert with whom Douglas M. Bregman, Bethesda, Md., was on the brief for Arnold Polinger, et al.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and PRYOR, Senior Judge.

STEADMAN, Associate Judge:

This case involves a protracted dispute which arose following a sale of develop-ment real property. The seller failed to seek the consent of the purchaser before applying for a special exception on adjacent property owned by the seller. The trial court found this failure to be a breach of the contract of sale. The cross-appeals be-fore us challenge, *inter alia*, the correct-ness of this finding, the calculation of dam-ages, and an award of attorney's fees. We affirm the finding of breach of contract. We remand for a corrected award of dam-ages and for further consideration of the question of attorney's fees.

I. The Facts

In early 1979, Arnold Polinger and coven-turers, as purchasers, entered into negotia-tions with Waverly Taylor, Inc. ("Taylor")[1] for the purchase of a parcel of property owned by Taylor overlooking the George-town Reservoir and Potomac River. Po-linger sought to exploit the view from the parcel (the "upper lots") by developing sin-gle-family homes. Taylor also owned prop-erty adjacent to the parcel in which Poling-er was interested. The adjacent property (the "lower lots") was at a lower elevation and was separated from the upper lots by an embankment. In March of 1979, Taylor and Polinger entered into a contract of sale for the upper lots. Among the provisions of the contract was Paragraph 16 (empha-sis added), which stated:

> Seller represents and warrants to Pur-chasers that *except as shown on the plan attached and on the D.C. land records* Seller has not made and will not make any commitments or representa-tions to the applicable governmental au-thorities, or any adjoining or surrounding property owners, which would in any manner be binding upon Purchasers or interfere with Purchasers' ability to de-velop and improve the property as con-templated by Purchasers, without first obtaining Purchasers' written consent, *provided that this paragraph shall not be interpreted to restrict Seller's right*

---

1. The litigation involved a number of individu-als and entities on Polinger's side as plaintiffs and the defendant was the selling corporation. For convenience, however, the transaction is treated in this opinion as if entered into by a single individual on each side. No special men-tion is made of particularized facts, irrelevant to this appeal, involving the several participants, such as, for example, that the promissory note and deed of trust were executed by Dumbarton Estates, a general partnership.

*to sell or otherwise transfer any other property owned by the Seller.*

The italicized sections were handwritten additions made by Taylor and initialed by both parties. The remaining portion was itself added to the original form of the contract by Polinger. The contract of sale was not a preprinted form contract but the testimony is conflicting as to which party prepared it originally. The closing took place in late October 1979 and Polinger signed a three-year promissory note for $250,000.00 secured by a deed of trust.[2] Polinger did not record the deed from Taylor to the upper lots until November 2, 1979.

Meanwhile, Taylor had also entered into negotiations for the sale of the lower lots and on April 25, 1979 executed a contract of sale with Management and Development Associates, Inc. ("MDA"). In Paragraph 12 of that contract, MDA agreed to prepare a development plan for the lower lots. Because it was likely that MDA would have to obtain a zoning change to develop the lower lots as it wanted, Taylor agreed to cooperate with MDA and "to sign all applications and other documents reasonably required in connection with [MDA's] development plan ... including any necessary application to the Board of Zoning Adjustment." In this connection, Taylor provided MDA with an authorization letter, stating: "You [MDA] are hereby authorized to file an application with the Board of Zoning Adjustment and otherwise to act on my [Taylor's] behalf in the above-referenced matter." On November 1, 1979, MDA applied to the Board of Zoning Adjustment ("BZA" or "Board") for a special exception to develop the land. The Board held a hearing on December 19, 1979 and approved MDA's development plan on April 7, 1980. Because Polinger did not record the deed until the day after the November 1 filing, Polinger was not a "record" owner of adjacent property on that day and did not, as provided for by BZA rules, receive notice that a hearing was to take place. The Board sent notice to Taylor, as record owner of the upper lots, but Taylor did not convey notice to Polinger. The result of the Board's approval was that MDA eventually built several 40–foot high townhouses that obstructed the views from the upper lots.

On October 18, 1982, Polinger sued Taylor for breach of contract, alleging, *inter alia,* that Taylor's authorization to MDA to approach the BZA for a zoning exception was in violation of Paragraph 16 of the contract of sale. On March 23, 1983, Taylor filed an answer and counterclaim for principal and interest due on the promissory note, which Taylor alleged Polinger had not paid since July 23, 1982. Taylor alleged that the amount of principal due as of July 23, 1982 was $129,687.50.

Following a bench trial, the trial court concluded that Taylor had breached Paragraph 16 of the contract of sale. It concluded that Taylor had made a "representation[ ] to [ ] applicable governmental authorities" in the form of MDA's application to the BZA, authorized by Taylor, and that the application "interfere[d] with [Polinger's] ability to develop and improve the property as contemplated by [Polinger]." The court rejected Taylor's proposed interpretation of the last clause of Paragraph 16—namely, that Taylor was not required to seek Polinger's consent when withholding of that consent would have been impermissible. The court interpreted Paragraph 16 in such a way as to give effect to both the obtain-consent and no-restriction-on-Seller's-right-to-sell provisions. The court concluded that, even assuming Polinger would not have been free under the last clause to withhold its consent to Taylor's or MDA's filing of an application with the BZA, requiring Taylor to seek to obtain that consent would not necessarily have been for naught since it would have put Polinger on notice of the proceeding and enabled Polinger to oppose the application. The court awarded Polinger damages of $150,000.00, an amount stipulated by the parties prior to trial. In addition, the court

**2.** No principal was due until the maturity date of October 23, 1982, but principal was prepayable and in fact Polinger did prepay it in part, as indicated by the amount of principal claimed to be still due in the counterclaim. Interest was payable in quarterly installments.

awarded $173,934.03 to Taylor on its counterclaim for the principal balance due on the promissory note plus accrued interest from the date of Polinger's default. Finally, the court awarded Taylor $7,953.75 in attorney's fees incurred in connection with its prosecution of the counterclaim.

## II. The Breach of Contract

■ Taylor first challenges the trial court's determination that Taylor breached Paragraph 16 of the contract of sale. In reviewing a trial court's determination as to the meaning of a contractual provision, we must ask first whether the meaning of the provision is plain on its face or whether it is ambiguous. *Sacks v. Rothberg*, 569 A.2d 150, 154 (D.C.1990). If the contract provision is ambiguous, *i.e.*, "reasonably susceptible of different constructions or interpretations," *1901 Wyoming Avenue Coop. Ass'n v. Lee*, 345 A.2d 456, 461 n. 7 (D.C.1975), our review is limited. In such a case, the trial court will essentially have been acting as a finder of fact, *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092 (D.C. 1988), and we will reverse only if the trial court's determination is "plainly wrong or without evidence to support it." D.C.Code § 17–305(a) (1989). Where a contract is ambiguous, the trial court may, explicitly or implicitly, consider extrinsic evidence such as "the circumstances before and contemporaneous with the making" of the contract, "all usages—habitual and customary practices—which either party knows or has reason to know," the "circumstances surrounding the transaction" and "the course of conduct of the parties under the contract." *1901 Wyoming Avenue Coop. Ass'n, supra*, 345 A.2d at 461–62.

Here, contrary to Taylor's first contention, the meaning of Paragraph 16 is not plain.[3] The obtain-consent requirement could, as Taylor argues, be seen as applicable only when the purchaser could rightly withhold consent. On the other hand, it could be read, as Polinger urged and as the trial court read it, to require the seller to seek consent, even where the purchaser could not rightly withhold consent.

■ The trial court heard evidence on three consecutive days, much of which it solicited, concerning the entire background and series of events involved in the dealings between the parties, including evidence about the formation of the contract. Included was the testimony of Arnold Polinger. On questioning by the court, Polinger testified that

> we [Purchasers] felt that we had the right to approve what they were going to do there within its reasonableness, so that it would be something that wouldn't hurt us.
>
> There would be some cooperation between the two of us and it wouldn't take the whole view where there would be some element of give and take on that.

Asked the basis for this view, Polinger explained:

> Well, we thought before they would go in for a rehearing [before the BZA] that they would bring us the plan, based upon Paragraph 16. "Here's our plan for what we're doing below. Do you have any comment? Do you approve it? Do you not approve it? Do you want to turn the lots this way or that way?"; and we mutually worked out some sort of plan we could support and they could submit.

Finally, asked what he thought Paragraph 16 meant at the time it was added, Polinger stated:

> As I interpreted this, originally we had the right to approve what plan they may make representation to the BZA with and we were to be arbitrary [*sic*]. It might be that they couldn't have sold that lot at

---

3. We reject Taylor's argument that the handwritten no-restriction-on-right-to-sell provision prevails over the rest of Paragraph 16 since it was specially added. Paragraph 16 itself was specially added to the rest of the contract by Polinger. Taylor then added another proviso. In contrast to *Craven v. Elmo*, 442 A.2d 526, 527, 528 (D.C.1982), and *Flack v. Laster*, 417 A.2d 393, 398 (D.C.1980), the present case involves neither the priority of a handwritten addition over preprinted standardized material nor a clear "conflict or inconsistency" between two provisions. *See* RESTATEMENT (SECOND) OF CONTRACTS § 203(d), at 93 (1981) ("separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated").

all and by putting this in, I read this to mean essentially we had to be reasonable in what we required so that they could still sell the lots and wouldn't be stuck with something which would essentially be made unusable.

In addition, Bernard Segerman, also one of the plaintiffs, testified that he never anticipated major development of the lower lots "without at least our being aware of what was going on and the chance to oppose it."

These portions of testimony are consistent with the trial court's perfectly reasonable interpretation of Paragraph 16 as requiring Taylor to seek Polinger's consent to proposed representations to governmental authorities that might affect Polinger's lots, even where Polinger might not withhold its consent in circumstances covered by the proviso clause. As the trial court indicated, Taylor's position would mean that he could anticipate Polinger's likely response, determine whether that response would be required under the provision, and then decide whether to seek Polinger's consent at all. Thus, Taylor would unilaterally make a determination as to what might be a contested issue; namely, whether consent could be withheld under the proviso. And in any event, an effort to secure Polinger's consent would have alerted Polinger to a pending event affecting his property.

In substance, the trial court interpreted the provision as one akin to a typical lease clause in which assignment of the leasehold by a tenant is prohibited without the consent of the landlord, "not to be unreasonably withheld." It would seem strange to think that a tenant could unilaterally assign his leasehold without seeking the landlord's consent on the basis that that consent could not be withheld. See *Brefries East End Inc. v. Platt*, 116 Misc.2d 574, 575, 457 N.Y.S.2d 677, 678 (N.Y.App.Term 1982) (per curiam) (under lease and statutory provisions requiring tenant to provide landlord with notice and obtain consent before subletting apartment, where tenant failed to take such steps "it is no answer to say, after the fact, that had the required notice been given, consent could not have been reasonably withheld"). If nothing else, the request would alert the landlord to the impending presence of a new tenant.[4]

Accordingly, we affirm the trial court's ruling that Taylor breached Paragraph 16 of the contract of sale.

### III. Calculation of Damages

As cross-appellant, Polinger raises two principal challenges.[5]

A. Polinger's first contention is that the trial court erred in awarding any interest to Taylor because Polinger's breach of contract claim entirely offset Taylor's claim for the amount due under the promissory note.[6] On October 18, 1982, Polinger filed his complaint alleging the breach of the contract of sale. Prior to trial, the parties stipulated that the amount of damages on this claim, if proven, would be $150,000.00. Taylor filed his counter-

---

**4.** *Cf.* D.C.Code § 10–225 (1989), requiring the approval of the distributor prior to transfer of a retail service station franchise, such approval not to be unreasonably withheld, referred to in *Dege v. Milford*, 574 A.2d 288, 291–92 (D.C. 1990). One might well question the validity of the transfer of a service station franchise made without seeking such approval on the basis that it could not be withheld.

**5.** In light of our ruling on his first challenge, Polinger's objection to the award to Taylor of post-tender interest is moot.

**6.** Taylor asserts that Polinger's notice of appeal, which designated certain "portions" of the December 17, 1986 judgment, was inadequate to preserve his right to raise this issue. "The [federal] courts of appeals have consistently given a liberal interpretation to the requirement of Rule 3(c) that the notice of appeal designate the judgment or part thereof appealed from." 9 J. MOORE, B. WARD & J. LUCAS, MOORE'S FEDERAL PRACTICE § 203.17[2], at 3–80 (2d ed. 1990). We have similarly interpreted our own nearly identical provision. *See Coleman v. Lee Washington Hauling Co.*, 388 A.2d 44, 45 n. 1 (D.C.1978). We think Polinger's notice of appeal in challenging the failure to award him prejudgment interest (which would at least have effectively offset the interest award to Taylor) and the award of interest to Taylor after a tender of payment sufficiently preserved the issue on appeal. Taylor does not assert any prejudice from the form of notice of appeal nor does he assert that appellate review is affected by any failure to properly present the issue during the course of the trial court proceedings.

claim on March 23, 1983, seeking the principal balance of $129,687.50, plus interest, claimed to be due on the deed of trust note. The trial court awarded Taylor the principal amount plus $44,246.53 in interest accrued between the date of default[7] and the date of trial, September 3, 1985. The court also awarded Taylor interest on the principal amount from the date of trial until completion of payment.

The legal issue presented by these facts is squarely controlled by our holding in *Giant Food, Inc. v. Jack I. Bender & Sons,* 399 A.2d 1293 (D.C.1979). In that case, Giant had installed carpet for Bender. Subsequently, Bender informed Giant that the carpet was defective and thus that Giant was in breach of an express warranty. While discussions on this point were underway, Giant bid upon and was awarded a contract by Bender to install replacement carpeting. *Id.* at 1297. The contract provided for interest on any unpaid balance at 18% per annum. Giant installed the new carpeting but Bender refused to pay the contract price of $40,139.92, claiming that Giant was obligated to do the job in any event because of the breach of warranty. The trial court found that Giant indeed had breached the warranty and that Bender was damaged in the amount of $20,731.50. *Id.* at 1298.

The major issue on appeal was the proper award of interest. We discussed at length the several different possible rules of law that could be used in determining the allowance of interest where liquidated claims are allegedly in whole or in part offset by unliquidated claims. *Id.* at 1299–

1301. In circumstances such as those presented here, we adopted the so-called "interest on the balance" rule, *id.* at 1302, which allows interest only on the difference between the amount of one party's liquidated claim and the amount of the other party's counterclaim. *Id.* at 1300. We noted that the appropriate inquiries to be made are whether the offsetting claim could " 'be said to be demandable at the time when the original liquidated claim became due' " and whether the offsetting claim was " 'the proper subject of a counterclaim for damages [rather] than an offset in the nature of a payment.' " *Id.* at 1302 (citation omitted).[8] Since Bender's breach of warranty claim "existed, and was demandable" long prior to the time when Giant's liquidated claim became due and since furthermore the subject matter of both transactions involved carpeting of the same floors of a building and the second transaction was a direct outgrowth of the first, we held that Giant was "really only deprived of the use of money to the extent of the difference between the two claims," and hence entitled to interest at the contract rate on the difference between the two amounts, *viz.,* on $19,408.42.

There is no purpose in repeating here the extensive review of authorities contained in that case. Here, as there, the unliquidated claim was in existence at the time the liquidated debt came due.[9] Here, as there, interest was provided for by contract on the liquidated claim.[10] Here, as there, the two claims were intimately related. Indeed, in the case before us, the liquidated debt was expressly contemplated by the very con-

---

7. The counterclaim alleged that Polinger was in default of the note as of July 23, 1982.

8. Where the unliquidated claim does not "directly concern" the liquidated claim, that is, where the unliquidated claim "arises out of a collateral matter," *id.* at 1302, the applicable rule is that of "interest on the entire claim." Under that rule, interest is calculated on the full amount of the liquidated claim; the amount of the unliquidated counterclaim is then subtracted from the full amount of the liquidated claim to determine the final award. *Id.* at 1300.

9. In *Giant Food,* the plaintiff was the holder of the liquidated debt and the counterclaim in-

volved the unliquidated debt. In our case, the positions are reversed, but the principle involved is the same.

10. We must reject Taylor's argument that the present case is to be distinguished from *Giant Foods* in that the interest there did not begin to run until the defendant breached the sales contract, whereas here the interest was part of the agreement between the parties and served as consideration for Taylor's execution of the note. In both cases, interest was provided for by contract and equally constituted a ground for relief. Indeed, almost all of the accrued interest claimed by Taylor related to the period following the due date of the note.

tract that was the subject of the unliquidated breach claim; the contract of sale itself provided that the purchase price would, in part, consist of the purchase money deed of trust obligation incurred by Polinger in Taylor's favor.

Accordingly, we conclude that the "interest on the balance" rule must be applied in this case, and as a result, on the facts here, no interest can be deemed to accrue to Taylor.

■ B. Polinger's second contention— that he is entitled to interest on his breach of contract claim from the time that claim arose—is without merit. The long established rule in this jurisdiction is that prejudgment interest is not mandated for unliquidated claims, but is, at best, awarded in the trial court's discretion. D.C.Code §§ 15–108, –109 (1989); *District of Columbia v. Pierce Associates, Inc.,* 527 A.2d 306 (D.C.1987). Polinger's breach of contract claim was unliquidated for purposes of this rule. As with most damage claims, Polinger's was not "one which '*at the time it arose,* ... was an easily ascertainable sum certain,'" the definition of a liquidated debt. *Id.* at 311 (emphasis added) (quoting *Kiser v. Huge,* 170 U.S. App.D.C. 407, 421, 517 F.2d 1237, 1251 (1974), *rev'd in part on other grounds,* 171 U.S.App.D.C. 1, 517 F.2d 1275 (1975) (en banc)). Furthermore, prejudgment interest is now conceived of as "merely another element of damages," *id.,* and if the parties had contemplated such interest as an element of damages, they could have so provided in the stipulation.

## IV. Attorney's Fees

We come finally to the issue of attorney's fees. Taylor sought attorney's fees for defending, albeit unsuccessfully, against Polinger's breach of contract claim, as well as for prosecuting his counterclaim on the promissory note. Taylor based his asserted right to attorney's fees on several

provisions in the deed of trust, which provided for the recovery of attorney's fees in certain circumstances. The trial court concluded that those provisions authorized the award of attorney's fees for services incurred in attempting to collect on the debt through the counterclaim and in defending against Polinger's unsuccessful motion to prevent foreclosure as a part of the claim-in-chief, but did not create an entitlement to any attorney's fees incurred in defending against the breach of the contract of sale. Both parties challenge this ruling, Taylor on the ground that he is entitled to all his attorney's fees and Polinger on the ground that no fees at all should have been awarded.

The altered outcome of this case on appeal and several recent decisions of this court lead us to remand this issue for further consideration.[11] Our holding with respect to the interest calculation has significantly changed the position of the parties with respect to the substantive outcome of the litigation, Taylor now being, on balance, the unsuccessful litigant. Furthermore, the amount recovered on the debt, the element of the litigation on which the award of fees was based, is markedly reduced by the elimination of the interest component.

As we recently discussed at some length in *Fleming v. Carroll,* 581 A.2d 1219, 1227–28 (D.C.1990), "[i]t is generally understood that the degree of success in litigation is a relevant factor in the award of attorney's fees." Also, in *Kudon v. f.m.e. Corp.,* 547 A.2d 976 (D.C.1988), decided two years after the entry of the order appealed from in this case, we had occasion to expatiate upon four factors relevant in determining whether a party requesting an award of attorney's fees pursuant to a contract provision is entitled to a fee recovery for defending a claim by the party opposing payment of such fees. *Id.* at 980.

---

11. There is no merit, however, to Taylor's assertion that the trial court's setting of $7,953.75 as the amount of any fee award relating to enforcement of the debt is insufficiently supported by the evidence, especially in light of the limited evidence submitted by Taylor in this regard. *See District of Columbia v. Hunt,* 520 A.2d 300, 304 (D.C.1987) (recognizing broad discretion of trial court in calculation of attorney's fees).

Such considerations are also relevant to the issue raised by Taylor whether he is entitled to any attorney's fees related to his unsuccessful defense of the breach of contract action. The trial court based the denial on its interpretation of the less than pellucid attorney's fee language in the deed of trust as not applicable to the breach of contract action in any event, win or lose. The difficult question of interpretation of the deed of trust provisions, however, would be mooted if the lack of success in the defense of the breach of contract action is deemed by the trial court to be a sufficient basis for denial of any attorney's fees related to that defense, as permitted under the principles discussed in our cited recent cases.

Accordingly, the case is remanded for amendment of the judgment to reflect the requisite interest adjustment and for further consideration of the award of attorney's fees.

*So ordered.*